1 (<sub>o</sub>

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 3 1 2001

| | | |
|---|---|---|
| JIMMY HERRERA, | * | |
| Plaintiff | * | |
| | * | CIVIL ACTION NO.: |
| v. | * | B-01-024 |
| | * | |
| CTS CORPORATION, | * | |
| Defendant | * | |

Michael N. Milby
Clerk of Court

**BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is a disability discrimination case brought under the Texas

Commission on Human Rights Act, Chapter 21 of the Texas Labor Code

("TCHRA"). Plaintiff claims that CTS Corporation terminated his employment

because of his peripheral vascular disease. CTS Corporation asserts that

plaintiff's employment was terminated because he could not lift over 40 pounds,

an essential function of his job, with or without a reasonable accommodation.

## FACTS

CTS Corporation has manufacturing and distribution facilities throughout

the United States. Plaintiff Jimmy Herrera was employed at CTS Corporation's

Brownsville facility. Josie Molina is the Facility Manager and the person with

general charge of CTS's Brownsville facility. (Molina Declaration, ¶ 1 and 3).

Unless otherwise noted, references to CTS Corporation or CTS in this brief mean

CTS's Brownsville facility only.

The CTS Brownsville facility is a warehouse/distribution center with two

distinct functions. As a distribution facility, it receives finished goods from

overseas and Mexico, stores the goods, then ships them to customers upon instructions from another CTS facility.  As a warehouse, CTS receives component kits for its Mexican maquiladora, transports the kits to Mexico, receives finished product, and ships the finished product to customers.

Jimmy Herrera was hired by CTS as a shipping clerk on June 21, 1999. The principal job of a shipping clerk was to weigh outgoing cartons of product and calculate the correct shipping charges.  (Molina Declaration, ¶ 3).  To weigh these cartons, he had to lift them off of pallets, place them on a scale, lift the cartons off the scale, and put them back onto their proper place on the pallet. (Herrera depo., p. 21).  These cartons weighed up to 90 pounds.  (Molina Declaration, ¶ 3; Herrera depo., pp. 20-21).  A copy of the shipping clerk's job description is attached to Josie Molina's affidavit as Exhibit A.  With but half-dozen non-clerical employees in the warehouse/distribution area, there was no one who could routinely assist Herrera with his job.  (Molina Declaration, ¶ 3).

Because of on going medical problems later diagnosed as peripheral vascular disease (which plaintiff described as "blood clots in veins and arteries" (Herrera depo., p. 26)), plaintiff was scheduled for angioplasty on Thursday, March 23, 2000 to "open the clogged artery."  (Herrera depo., p. 31).  For various medical reasons, plaintiff's physician elected not to complete the angioplasty, but did perform a diagnostic heart catherization (Herrera depo., pp. 33-34).

Herrera returned to work on Monday, March 27, 2000 with a doctor's excuse (Exhibit 2 to Plaintiff's Deposition) that returned him to "light duty work."

(Herrera depo., pp. 38-39). Plaintiff told Josie Molina that "light duty" meant he could not lift over 5 pounds, could not squat or bend, and could not drive a forklift or do general housekeeping. (Herrera depo., p. 38). Plaintiff concedes that these restrictions were completely inconsistent with a shipping clerk's job (Herrera depo., p. 38).[1]

Josie Molina asked plaintiff to get these restrictions in writing, then sent him home pending receipt of a more detailed doctor's excuse (Herrera depo., pp. 38-39). Plaintiff did not return with the detailed excuse until April 10, 2000.[2] The excuse (Exhibit 3 to plaintiff's deposition) restricted plaintiff to lifting no more than 40 pounds with rest as needed.

During the two weeks in which Ms. Molina was waiting for plaintiff to produce the doctor's excuse and return to work, other non-clerical employees split Herrera's job functions so that goods could continue to be shipped. (Molina Declaration, ¶ 6).

Because his medical restrictions prevented Herrera from lifting the containers onto the scale for weighing and there were no other vacant positions for which Herrera was qualified and CTS could not otherwise reasonably accommodate his restrictions, his employment was terminated on April 12, 2000.

---

[1] Josie Molina states in her Declaration that Mr. Herrera did not present this note until April 11, 2000. However, the date that Ms. Molina received the note is not material so CTS will accept plaintiff's date of presentment for purposes of this motion.
[2] Josie Molina states in her Declaration that Mr. Herrera did not return with this letter until April 11, 2000. Again, the difference in date is not material so CTS accepts April 10, 2000 for purposes of this motion.

(Molina Declaration, ¶ 10 and 11). A copy of his termination notice is attached to his deposition as Exhibit 4.

Shortly thereafter, plaintiff applied for Social Security Disability Benefits. (Herrera depo., p. 55). He was awarded benefits in October 2000 based upon the Social Security Administration's finding that he had been disabled since April 14, 2000, two days after CTS terminated his employment. A copy of the Social Security Administration's determination letter is attached to plaintiff's deposition as Exhibit 5.

Plaintiff has not held a job since he stopped working for CTS, has not applied for work, and has declined job retraining offered him through the Texas Rehabilitation Commission. (Herrera depo., p. 59). He concurs with the Social Security Administration that he has been disabled since April 14, 2000. (Herrera depo., p. 60).

### ARGUMENT

#### Plaintiff Cannot Perform the Essential Functions of His Job With or Without a Reasonable Accommodation.

#### Elements of a Disability Discrimination Claim

Disability discrimination in covered by §§21.051 and 21.105 of the Texas Labor Code. §21.051 is the basic prohibition against discrimination based on disability, while §21.105 limits disability discrimination to "discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job." This means that plaintiff must not only prove a disability, but also "that he can perform all essential functions of

the job or ...that he could be reasonably accommodated....""  Jenkins v. Guardian Industries Corp., 165 SW3d 431, 440 (Tx.App. – Waco 2000, rev. denied).

The Texas Commission on Human Rights Act is modeled after federal employment discrimination laws with the express purpose of correlating state and federal law.  NME Hospitals, Inc. v. Rennels, 994 SW2d 142, 144 (Tx. 1999). Accordingly, Texas courts look to analogous federal precedent in interpreting the TCHRA, M.D. Anderson Hospital and Tumor Institute v. Willrich, 28 SW3d 22, 24 (Tx. 2000), including the "reasonable accommodation" analysis of the Americans with Disabilities Act, 29 USC §1211(8) and (9).  Austin State Hospital v. Kitchen, 903 SW2d 483 (Tx.App. – Austin 1995, no rev. req.).

The protection of the ADA extends only to "qualified individuals with a disability."  42 USC §12112(a) ("No covered entity shall discriminate against a qualified individual with disability...").  A qualified individual with a disability is as "an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 USC §12111(8).

The focus of the statute is not on the disability but rather on job performance.  The proper inquiry is not whether an employee is disabled but rather, can the employee do the job?  Taylor v. Principal Financial Group, Inc., 93 F3d 155, 164 (5 Cir. 1996) ("...the ADA requires employers to reasonably accommodate limitation not disabilities.").  If yes, the disability must be

disregarded.  If no, the inquiry is can the employee do the job with a little help?
(i.e., "reasonable accommodation").  If yes, the employee must be given that
assistance.  If no, the employee may be treated the same as any non-disabled
employee who cannot do the job.

**Plaintiff Cannot Perform the Essential Functions
of His Job Even With a Reasonable Accommodation**

For purposes of this motion, CTS Corporation accepts that plaintiff is
"disabled" within the meaning of the TCHRA.  The issue then is whether Herrera
can prove that he can perform the essential functions of a shipping clerk or
whether there is any reasonable accommodation that would permit him to
perform those essential functions.  Austin State Hospital v. Kitchen, 903 SW2d
83 (Tx.App. – Austin 1995, no rev. req.).  It is CTS's position that plaintiff can
prove neither.

**Essential Functions of Plaintiff's Job**

The EEOC has defined a function as "essential" if the job position exists in
order to perform the function.  29 CFR 1630.2(n).  Factors to be considered in
determining whether a function is essential include the employer's judgment as to
which functions are essential, written job descriptions prepared before
interviewing applicants for the job, and the consequences of not requiring the
incumbent to perform the job.  Riel v. Electronic Data Systems Corp., 99 F3 678,
682-682 (5 Cir 1996) (citing 29 CFR 1630.2(n)).

The essential function of the shipping clerk's job (and its reason for being)
is to see that goods are properly shipped, tracked, and charged.  (Molina

.

Declaration, ¶ 3). In order to do this, cartons must be moved from a pallet to the scales, then back to a pallet. This requires lifting the carton onto a scale. Since a carton can weigh up to 90 pounds, this means that the shipping clerk must have the physical capability of lifting this much weight and must further have the physical capability of maneuvering the carton onto its proper position on the pallet. If the shipping clerk is not able to do this, either goods would not be shipped or cartons would leave the facility unweighed and uncharged.

Weighing the cartons is therefore an essential function of the shipping clerk's job and lifting the carton is an integral part of the process. Mr. Herrera could not lift any carton over 40 pounds, therefore he could not perform an essential function of his job.

### Effect of Receiving Social Security Disability Benefits

Plaintiff's receipt of Social Security Disability benefits puts the burden on him to explain how he can be "disabled" for purposes of collecting disability benefits, yet do the essential functions of the shipping clerk's job. Cleveland v. Policy Management Systems Corporation, 526 US 795, 807 (1999).

As noted by the court in Donahue v. Occidental Chemical Corp., 1999 US Dis. Lexis 20119 (E.D. La 12/27/99) (copy attached), Social Security disability benefits are awarded to individuals who, because of physical or mental impairments, not only cannot do their previous job but also "cannot...engage in any other kind of substantial gainful work which exists in the national economy." Donahue at 15, citing 42 USC §423(d)(2)(A).

To avoid summary judgment, Herrera must come forward with proof that he could perform the essential functions of a shipping clerk, notwithstanding his inability to "engage in any other kind of substantial gainful work...." As the Supreme Court explained in <u>Cleveland</u>, supra:

> "[A]n ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodations.'" 526 US at 798.

Unless Herrera can explain why there is no factual inconsistency between his inability to engage in any "...kind of substantial gainful work" and his professed ability to perform the essential functions of a shipping clerk (including lifting up to 90 pounds), his case should be dismissed. See e.g., <u>Reed v. Petroleum Helicopters, Inc.</u>, 218 F3d 477 (5 Cir. 2000), rejecting plaintiff's explanation that disability benefit determination do not take "reasonable accommodation" into account and affirming summary judgment for the employer.

## Reasonable Accommodation

Under the Texas Commission on Human Rights Act, it is plaintiff's burden to prove that "an accommodation is possible that would enable [him] to perform the 'essential functions' of the position [he] holds or seeks." <u>Austin State Hospital v. Kitchen</u>, 903 SW2d 83, 92 (Tx.App. – Austin 1995, no rev. req.). The inquiry, therefore is whether plaintiff can prove that a reasonable accommodation would have permitted him to perform a shipping clerk's essential functions – that is

getting the cartons to the scale, weighing the cartons to compute the shipping charge, then getting the cartons to the loading area.

The accommodation must be in the context of Herrera's job as a shipping clerk. CTS had no obligation to create a new position for Herrera or to bump an employee from an existing job. Taylor v. Pathmark Stores, Inc., 177 F3d 180, 195 (3 Cir. 1999), citing EEOC Technical Assistance Manual at 90.0530. And, as Josie Molina states in her Declaration, there were no open positions into which plaintiff could be moved. (Molina Declaration, ¶ 10).

The only remaining accommodation would be to modify the shipping clerk's job so that Herrera would not have to lift or maneuver cartons over 40 pounds. Such an accommodation would not be reasonable, however, because that would require determining in the first instance (presumably by weighing) which cartons were more than 40 pounds and which were less than 40 pounds. To stay within Herrera's restrictions, this "pre-weighing" would have to be done by another CTS employee. But, while the carton is being "pre-weighed" to see if it exceeds 40 pounds, efficiency demands that this weighing also be used as the weighing to calculate shipping charges, which is one of the essential functions of the shipping clerk.

As a practical matter, then, Herrera can only be "accommodated" by having someone else perform one of the essential functions of his job. But if he cannot perform the essential functions of his job even with a reasonable accommodation, he is no longer a "qualified individual with a disability," 42 USC

§12111(8) and no longer protected by the ADA or the TCHRA. As stated by the

Fifth Circuit in Barber v. Nabors Drilling U.S.A., Inc., 130 F3d 702 (5 Cir. 1997):

> "…[T]he law does not require an employer to transfer from the
> disabled employee any of the essential functions of his job. If it is
> necessary to transfer any of the essential functions of [the] job to others…,
> the [plaintiff] is not otherwise qualified. We cannot say that he can
> perform the essential functions of the job with reasonable accommodation
> if the only successful accommodation is for Barber not to perform these
> essential functions."

See also, Burch v. City of Navasota, 174 F3d 615, (5 Cir. 1999) ("[T]he

ADA does not require an employer to relieve an employee of any essential

function of his or her job, modify those [essential] duties, reassign existing

employees to perform those jobs, or hire new employees to do so.").

## CONCLUSION

Plaintiff cannot perform the essential functions of a shipping clerk and

there is no reasonable accommodation that would permit him to do those

functions. Accordingly, plaintiff is not a "qualified individual with a disability."

Defendants motion for summary judgment should be granted and this case

dismissed.

Signed this _3/_ day of October 2001.

Respectfully submitted,

John E. Chosy Attorney-at-Law, P.C.
1805 Ruben M. Torres Blvd., Suite B-21
Brownsville, Texas   78526
Telephone: (956) 544-6677
Telefax    : (956) 544-6679

By: _____
    John E. Chosy
    State Bar No. 04216300
    Cameron County ID No. 00304801
    Federal I.D. No. 1054
    Attorney-in-Charge

ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served on all counsel of record in this matter in accordance with the Federal Rules of Civil Procedure by certified mail, return receipt requested on the _3/_ day of October 2001.

_____
John E. Chosy

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JIMMY HERRERA            ) (
    Plaintiff        ) (
                ) (
VS.                      ) (  CIVIL ACTION NO. B-01-024
                ) (
CTS CORPORATION          ) (
    Defendant        ) (

---

ORAL DEPOSITION OF
JIMMY HERRERA
SEPTEMBER 13, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF JIMMY

HERRERA, produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on SEPTEMBER 13, 2001, from 9:20 a.m. to 11:21 a.m.,

before LOU ZUNIGA, Certified Court Reporter No. 2198,

in and for the State of Texas, at the offices of John

E. Chosy, 1805 Ruben M. Torres Boulevard, Paseo Plaza

Center, Suite B-21, Brownsville, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached therein.



HILL & ROMERO
CERTIFIED COURT REPORTERS

```
 1        A.   Filing.

 2        Q.   Okay.  Do you know, did they have someone in

 3   the office who the only thing they did was file?

 4        A.   No.

 5        Q.   What was your job, either a material handler or

 6   a shipping clerk?  It makes no difference because you

 7   did the same thing, you told me.  What did you do in a

 8   day?

 9        A.   Just receive packages from the other department

10   that was there.  The other department there would fill

11   up the boxes.  They would send them to me on a skid.  I

12   would weigh the boxes and stock them properly on a skid

13   and shrink-wrap them and load them in the truck with

14   the forklift.

15        Q.   Where was this other department?

16        A.   This other department was in the same

17   warehouse.

18        Q.   Okay.

19        A.   It was at the warehouse.

20        Q.   So that department would pack boxes?

21        A.   Pack boxes.

22        Q.   And then once the boxes were packed, give it to

23   you?

24        A.   Right.

25        Q.   How much did these boxes weigh?
```

1    A.  On average I would say they were anywhere from

2    two pounds, one pound -- there were envelopes to 90

3    pounds, 70 pounds.  On average I would say 35 to 40

4    pounds.

5    Q.  All right.  And you would eventually load them

6    onto the truck?

7    A.  After I load them on the skid, I would load

8    them on the truck with the forklift, yes.

9    Q.  All right.  Did you have to weigh the packages?

10    A.  Yes, I did.

11    Q.  How do you go about weighing them?

12    A.  Well, they would -- my work station was -- I

13    had my work station, and the other department would

14    bring the skid about two feet away from my work

15    station.  I would just pick them up and put them on the

16    scale and put them on a different pallet right next to

17    the other one.

18    Q.  Okay.  And you would follow the same procedure

19    whether it was an envelope that weighed a pound up to

20    one of these cartons that weighed 90 pounds?

21    A.  Yes.

22    Q.  How high up was the scale?

23    A.  The scale was about three feet.

24    Q.  All right.  So whatever it was, you had to lift

25    it up three feet, put it on the scale, weigh it and

1  charges?

2      A.  No.  We would pull up -- we had the system, UPS

3  system, and we had our customers -- list of customers

4  in the system.  And I would pull up their file, the

5  screen would come up, and I would just enter the weight

6  they would get charged for the freight.

7      Q.  Okay.  You have -- according to your lawsuit

8  papers, you have peripheral vascular disease?

9      A.  Correct.

10      Q.  Can you tell me -- and you're not a doctor, you

11  have never had any medical training, correct?

12      A.  Correct.

13      Q.  And so you will be answering these questions

14  really from a layman's understanding, and I will accept

15  that.  But what do you understand peripheral vascular

16  disease to be?

17      A.  It's just blood clots to the veins, the

18  arteries.

19      Q.  Okay.  When did you first start having

20  problems?  And I'm talking about medical problems that

21  eventually were diagnosed as peripheral vascular

22  disease.

23      A.  Way before I was diagnosed, I noticed the

24  problems in my legs in high school, pain to my feet.

25      Q.  Okay.  Did you get any medical treatment for

 1      Q.   When you went to VBMC -- Valley Baptist Medical

 2   Center?

 3      A.   (Moving head up and down).

 4      Q.   Yes?

 5      A.   Yes.

 6      Q.   Was that before you went to see Dr. Kotta?

 7      A.   I can't remember.

 8      Q.   All right.  So as you sit here now, your best

 9   recollection is that you started going to doctors for

10   your ulcer in January of 2000?

11      A.   Correct.

12      Q.   All right.  So Dr. Campbell was treating you

13   basically with pain medication?

14      A.   Yes.

15      Q.   Who did you see next?

16      A.   From there I think they both concluded that I

17   would see Dr. Ascarrunz.

18      Q.   All right.  And what kind of a doctor is Dr.

19   Ascarrunz?

20      A.   Dr. Ascarrunz, he's, I believe, a surgeon.

21      Q.   All right.

22      A.   And he performed a -- well, he was going to try

23   and perform an angioplasty to open the clogged artery,

24   but he didn't do the angioplasty.  He did -- well, he

25   saw that the veins were swelled up, and he didn't

                          HILL & ROMERO
                    CERTIFIED COURT REPORTERS

1    A.   That was the angioplasty.

2    Q.   Okay.

3    A.   That was the angioplasty.  Yeah, that was the

4    angioplasty.

5    Q.   Okay.  They, in fact, did do an angioplasty?

6    A.   No.  That was the procedure, angioplasty.  But

7    he didn't do the angioplasty.  He went in there and

8    made the incision and took in the -- they insert dye

9    into your legs.  And that's when he determined that he

10   couldn't do the angioplasty for fear of causing more

11   damages to my legs.

12   Q.   Okay.  So he went and did the diagnostic kind

13   of stuff?

14   A.   Exactly.

15   Q.   And then determined that he wouldn't finish the

16   procedure?

17   A.   Right.  Exactly.

18   Q.   All right.  During March of 2000, did you have

19   a heart catheterization?

20   A.   No.

21   Q.   Okay.

22   A.   What's that?

23   Q.   Heart catheterization.

24   A.   Yes.  At that time they checked my heart and my

25   abdomen, if that's what you are asking.

1    Q.  Did they run a tube up?

2    A.  Exactly, yes.

3    Q.  All right.  And, again, according to the

4    information I have got, you had the heart

5    catheterization and then you took the next day off of

6    work to recuperate from that?

7    A.  Yes.

8    Q.  Okay.  When did you first advise anyone at CTS

9    that you had -- that you were having these medical

10   problems?

11   A.  I believe it was my first appointment, in

12   January.

13   Q.  And who did you tell?

14   A.  I told Josie Molina.

15   Q.  And what did she say?

16   A.  Well, she said that it was just a doctor's

17   appointment, that it was fine.

18   Q.  Okay.  Did you report -- did you tell Josie or

19   anybody else at CTS what the doctor had told you or

20   what treatments you were getting?

21   A.  No.  You know, I kept Josie aware of the

22   procedures and everything.

23   Q.  Okay.  Did you tell her -- again, the notes

24   that I have got, just to give you the dates I have got

25   here, and if you don't agree with these, please correct

1  catheterization?

2      A.  Right.

3      Q.  Did you ever tell Josie that you could not lift

4  anything over five pounds?

5      A.  Yes, I did.

6      Q.  Okay.  No squatting or bending?

7      A.  Yes, I did.

8      Q.  And that you couldn't drive the forklift or do

9  housekeeping?

10     A.  Yes, I did.

11     Q.  All right.  Was there anything left of a

12  shipping clerk's job that you could do consistent with

13  those restrictions?

14     A.  I don't believe so.

15     Q.  Okay.  What did Josie say when you told her

16  about these restrictions?

17     A.  She needed a more detailed excuse.

18     Q.  Okay.

19     A.  What I was telling her verbally, she needed it

20  in writing from the doctor.

21     Q.  Okay.

22     A.  So she sent me home until I got a more detailed

23  excuse.

24     Q.  Okay.  Now, the one that you have in front of

25  you, Exhibit No. 2, take a look at it carefully.  Are

1    you sure you gave that to her when you returned to work

2    on Monday, March 27th?

3        A.  If I remember correctly, yes, I did.

4        Q.  Okay.  I just want to make sure I have got my

5    days of the week right.  When was the next -- okay.

6    Did you work the 27th, or did you go home?

7        A.  I don't remember the dates, really.

8        Q.  Okay.  The information I have is the 27th of

9    March was a Monday, that was the day you came back to

10   work after your heart cath, that you then either went

11   home voluntarily or you were sent home because of your

12   work restrictions?

13       A.  Correct.  The doctor told me that I could

14   return back to work, and he also said that if I needed

15   to take some time off, which was normal.  The nurses

16   also instructed me that if I couldn't -- if I would

17   have trouble that I should take a seven-day rest.

18       Q.  All right.

19       A.  I believe that's what I ended up doing, not

20   take the full -- I think I did.  I can't remember.

21       Q.  Okay.  But you did not go back to work and work

22   a full day?

23       A.  No.

24       Q.  Okay.  Did anybody give you any grief or

25   aggravation about leaving?

HILL & ROMERO
CERTIFIED COURT REPORTERS

1   procedure done.  She seemed very understanding at the

2   time.  So I went through the procedure and was looking

3   forward to going back and work at the office.

4       Q.  All right.  Did she tell you what you would be

5   doing in the office?

6       A.  No, she didn't tell me.

7       Q.  Okay.

8       A.  She didn't say -- she didn't make clear what I

9   would be doing, but she said she would get me to do

10  something in there.  As far as her being clear on what

11  I was going to be doing, no.

12      Q.  All right.  You went to -- you applied for

13  social security disability, correct?

14      A.  Correct.

15      Q.  All right.  How soon after your layoff did you

16  go apply for social security disability?

17      A.  I can't recall.

18      Q.  All right.  And where did you apply?

19      A.  At the Harlingen office.

20      Q.  Okay.  Did you have to fill out a

21  questionnaire?

22      A.  I don't remember.

23      Q.  You had to fill out a paper that asked you a

24  bunch of questions?

25      A.  I don't remember if it was a questionnaire.

1    copy of his report?

2        A.   No.

3        Q.   You filled out these papers on your first visit

4    to social security?

5        A.   Correct.

6        Q.   You went to Texas Rehab where they offered you

7    the retraining.  Did you fill out any paper at Texas

8    Rehab?

9        A.   I didn't go to Texas Rehab.  They didn't send

10   me there.  They suggested they could help me with --

11       Q.   Oh, okay.

12       A.   I never had an appointment or they just -- the

13   lady that took my application told me, this is what you

14   can do.  This is an option.

15       Q.   This is the lady at the social security?

16       A.   That's correct.

17       Q.   Okay.  So you never did go to Texas Rehab?

18       A.   No, I didn't.

19       Q.   Okay.  And social security then set up the

20   appointment with Dr. Pardo?

21       A.   Right.

22       Q.   All right.  And so you had the examination with

23   Dr. Pardo?

24       A.   Correct.

25       Q.   Did social security require you to do anything

1  else other than this initial bunch of papers and the

2  examination from Dr. Pardo before you were awarded

3  benefits?

4      A.  No.

5      Q.  Okay.  The social security determination,

6  Exhibit 5, says that you became disabled as far as

7  social security is concerned on April 14th, 2000.  Do

8  you disagree with that?

9      A.  I agree.

10     Q.  Okay.  And you have been getting monthly checks

11 from social security?

12     A.  Yes.

13     Q.  You still get them?

14     A.  Yes.

15     Q.  All right.  Have you gone back to social

16 security and told them that there's been a change in

17 your medical condition?

18     A.  No.

19     Q.  Okay.  Have you told them that, gee, I think I

20 can go back to work?

21     A.  No.

22     Q.  All right.  Have you talked to social security

23 at all --

24     A.  No.

25     Q.  -- since you started getting the checks?



## VALLEY DIAGNOSTIC CLINIC
2200 Haine / Harlingen, Texas 78550-8599
956/425-7200      1-800-338-4590

### Certificate to Return to Work or School

Name _Herrera, Jimmy_

has been under my care from _3|2|00_ to _present_

and is able to return to ~~work~~/school on _3|31|00_

If unable to return to school/work you must return to this office on the above date.

☐ restrictions    ☑ light work    ☐ other _____

physical education    ☐ may take    ☐ limited    ☐ may not take

Comments _Dx: PVD_

Doctor _AC Brown_

Date _03|30|00_

M200434 (Rev. 5-97)

Defendant's Exhibit

2



# VALLEY DIAGNOSTIC CLINIC, P.A.

04/10/00

RE:  Jimmy Herrera
     VDC# 87390

To Whom It May Concern:

Mr. Herrera has been under my care since March 2000.  The patient
suffers from severe peripheral vascular disease most likely the
vasculitis type.  This is mainly effecting the right lower
extremity and the left upper extremity.  As a consequences of
this vascularity the patient developed an unhealing ulcer
effecting the right lower extremity.  Arteriogram was performed
demonstrating complete occlusion of the popliteal artery at the
level of the right lower extremity and severe stenosis of the
brachial artery in the left upper extremity.

On basis of these factors the patient should have some
restrictions on his physical activity.  He will not be able to
lift or push weights more than 40 pounds and he should rest as
long as he develops pains during his walking activity.  The
patient also has my medical advice to have further appointments
with Dr. Kotta for further work-up of vasculitis and possibly he
will be involved in hyperbaric treatments for this unhealing
ulcer.

If you need any further assistance regarding Mr. Herrera please
do not hesitate in contacting me.

Sincerely,

ROLANDO C. ASCARRUNZ, M.D.

RCA/tl
DD:  04/10/00
DT:  04/10/00
JOB# 12095

Defendant's Exhibit
3

2200 Haine / Harlingen, Texas 78550 / (956) 425-7200

April 12, 2000

Jimmy Herrera
Rt. 1 Box 101-J
San Benito Tx. 78586

Dear Mr. Herrera:

We have reviewed all our available jobs at the CTS Brownsville facility in light of your current work restrictions. Our evaluation has found that no work is available for you at this time as we are unable to accommodate your current work restrictions.

As a result of our evaluation, effective today, Wednesday, April 12, you will be placed on Layoff status. You will be eligible for recall subject to a change in your work restriction status.

Within the next few weeks you will receive information regarding your COBRA rights which allow you to continue your group medical and dental coverage at your own expense.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Josie Molina
Facility Manager
CTS Corporation
1100 Roosevelt St.
Brownsville TX. 78521

Cc:    Personnel file

Defendant's Exhibit

# Social Security Administration
# Retirement, Survivors and Disability Insurance
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: October 17, 2000
Claim Number: 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HA

JIMMY HERRERA
1041 EBANO
SAN BENITO, TX 78586-3112

You are entitled to monthly disability benefits beginning October 2000.

**The Date You Became Disabled**

We found that you became disabled under our rules on April 14, 2000.

However, you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits. For these reasons, your first month of entitlement to benefits is October 2000.

**What We Will Pay And When**

- You will receive $706.00 for October 2000 around November 15, 2000.

- After that you will receive $706.00 on or about the third Wednesday of each month.

The day we make payments on this record is based on your date of birth.

**Other Social Security Benefits**

The benefit described in this letter is the only one you can receive from Social Security. If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application.

**Your Responsibilities**

The decisions we made on your claim are based on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

Enclosure(s):
Pub 05-10153

C                              See Next Page

Defendant's Exhibit

5

Case 1:01-cv-00024   Document 16   Filed in TXSD on 10/31/2001   Page 28 of 39

We have enclosed a pamphlet, "When You Get Social Security Disability Benefits...What You Need To Know." It will tell you what must be reported and how to report. Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

A state or other public or private vocational rehabilitation provider may contact you to talk about their services. The rehabilitation provider may offer you counseling, training, and other services that may help you go to work. To keep getting disability benefits, you have to accept the services offered unless we decide you have a good reason for not accepting.

You do not have to wait to be contacted about vocational rehabilitation services. You can contact the nearest state vocational rehabilitation office directly and let them know that you are interested in receiving services.

If you go to work, special rules can allow us to continue your cash payments and health insurance coverage. For more information about how work and earnings may affect disability benefits, you may call or visit any Social Security office. You may wish to ask for any of the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).

- How Social Security Can Help With Vocational Rehabilitation (SSA Publication No. 05-10050).

**Do You Disagree With The Decision?**

If you think we are wrong, you have the right to appeal. A person who did not make the first decision will decide your case. We will correct any mistakes. We will review those parts of the decision which you believe are wrong and will look at any new facts you have. We may also review those parts which you believe are correct and may make them unfavorable or less favorable to you.

- You have 60 days to ask for an appeal.

- The 60 days start the day after you receive this letter.

- You must have a good reason if you wait more than 60 days to ask for an appeal.

**Things To Remember For The Future**

Doctors and other trained staff decided that you are disabled under our rules. However, we must review all disability cases. Therefore, we will review your case in 5 to 7 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

## If You Want Help With Your Appeal

You can have a friend, lawyer or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due benefits to pay toward the fee.

## If You Have Any Questions

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-956-423-5227. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
320 E JACKSON ST
HARLINGEN, TX 78551

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

*Carolyn W. Colvin*

Carolyn W. Colvin
Deputy Commissioner
for Operations

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JIMMY HERRERA,           *
       Plaintiff            *
                        *       CIVIL ACTION NO.:
v.                       *        B-01-024
                        *
CTS CORPORATION,       *
       Defendant        *

## DECLARATION OF JOSIE MOLINA

STATE OF TEXAS       *
COUNTY OF CAMERON  *

      Josie Molina being first duly sworn, on oath says that:

      1.      I am the Facility Manager at CTS Corporation, 1100 Roosevelt St.,

Brownsville, Texas 78521 ("CTS"). I have been employed by CTS since October

24, 1983 and have general charge of CTS's Brownsville Facility. The following

facts are within my personal knowledge and, if called as a witness, I could testify

competently with respect thereto.

      2.      The CTS Brownsville facility is a warehouse/distribution center with

two distinct functions. As a distribution facility, it receives finished goods from

overseas and Mexico, stores the goods, packs them in cartons, then ships them

to customers upon instructions from another CTS facility. As a warehouse, CTS

receives component kits for its Mexican maquiladora, transports the kits to

Mexico, receives finished product, and ships the finished product to customers.

CTS Brownsville employs 11 persons besides myself, five of which are clerical

workers.

3.  Plaintiff Jimmy Herrera, was hired on June 21, 1999.  His position was Shipping Clerk.  He was the only Shipping Clerk employed by CTS.  The Shipping Clerk weighs all cartons shipped by CTS in order to calculate the correct shipping cost.  This job requires the Shipping Clerk to lift cartons weighing up to 70 pounds from a skid onto an electronic scale.  Once the carton is weighed, the clerk has to lift it off the scale, and push and maneuver the carton back onto the skid.  Use of the electronic scales to weigh cartons is an essential function of the Shipping Clerk's job.  Mr. Herrera spent a substantial portion of each day performing this task.  The Shipping Clerk is also required to lift cartons, operate a forklift, assist the Material Handlers in the stock areas, assist in receiving of cartons of products and do packing and housekeeping duties.  The job description for a Shipping Clerk is attached as Exhibit A.  With only 6 non-clerical employees in the facility, there was no one who could routinely assist the Shipping Clerk.

4.  Mr. Herrera was absent from work for a half day on Wednesday, March 22, 2000 and all day on Thursday, March 23 and Friday, March 24, 2000. When he returned to work on Monday, March 27, Mr. Herrera told me that he had "a procedure done" on March 23.  He said that he could not lift anything over 5 pounds, could not squat or bend, could not drive the forklift or perform any housekeeping duties.  I asked Mr. Herrera if he had a doctor's note for the period that he was absent, as well as documentation regarding the restrictions which he said he had.  Mr. Herrera said he had a note but he had forgotten to bring it in.

CNMPDF - www.fenno.com

5.     I told Mr. Herrera that I would need a note from his doctor concerning his absences, documentation related to any restrictions he might have, and a release indicating that he was released to return to work. I told him that he needed to provide this documentation to me before he could return to work. Mr. Herrera indicated that he was feeling discomfort from the procedure. I told him that if he did not feel well, he should see his doctor and suggested that he could also obtain the required documentation from his doctor at that time. Mr. Herrera left.

6.     The need for someone to do the Shipping Clerk's job continued during plaintiff's absence. Accordingly, Nancy Arambula was moved from the office to the distribution department to do the weighing and preparation of shipping documents. David Gonzalez, plaintiff's supervisor, did Herrera's job in the warehouse department as well as his own with assistance hired on a temporary basis when needed. However, all of these jobs required lifting or pushing cartons over 40 pounds from time to time or maneuvering those cartons onto their proper place on a pallet so none were within Mr. Herrera's work restrictions.

7.     Mr. Herrera called in to work intermittently but other than coming to the warehouse to pick up his pay check on March 31, he did not come to the warehouse for work until Tuesday, April 11 when he brought in two documents. The first was a "Certificate of Return to Work or School" dated March 30, 2000, signed by Rolando C. Ascarrunz, M.D., which indicated that Mr. Herrera had been under the doctor's care since March 2, 2000. It also stated that Mr. Herrera

CMPDF - www.fenrio.com

was released to return to "light work" on March 31, 2000.  This document is attached as Attachment B.

8.      The second document given to me by Mr. Herrera was a letter dated April 10, 2000 from Dr. Ascarrunz which stated that Mr. Herrera "suffers from severe peripheral vascular disease" and "will not be able to lift or push weights more than 40 pounds and he should rest as long as he develops pain during his walking activity."  This document is attached as Attachment C.

9.      I told Mr. Herrera that I would evaluate whether we had any work available for him but I thought it was unlikely that we would be able to accommodate his restrictions, given that CTS is warehouse operation devoted to receiving, storing, packing and shipping large cartons of goods.

10.      I consulted with Mary DeVous, Human Resources Manager for CTS Corporation, at CTS' corporate offices in Elkhart, Indiana.  We reviewed the following factors:  (1) There were currently no open jobs at CTS – Brownsville, so reassignment of Mr. Herrera to a vacant position was not possible; (2) Mr. Herrera, with a hire date of June 21, 1999, was the least senior employee in the facility, having worked for CTS less than one year, so any reassignment would require the displacement of a more senior employee; (3) Mr. Herrera could not lift or push weights of more than 40 pounds, which meant that he could not perform essential functions of his job, including but not limited to using the electronic scales to weigh cartons of products, lifting containers, assisting the Material Handlers in the stock areas, packing items weighing over 40 pounds, and assisting in receiving, and performing housekeeping duties; (4) Mr. Herrera was

the only Shipping Clerk; and (5) in our small warehouse operation, it would not be possible to create a new, "light duty" job for Mr. Herrera to accommodate him.

11.    After evaluating the factors set forth above, Ms. DeVous and I concluded that we had no choice but to lay off Mr. Herrera because we had no work available that he could do. I notified Mr. Herrera that he was being laid off, effective April 12, 2000. (See Attachment D.)

12.    In addition, the changes that are described in paragraph 6 of this Declaration meant that CTS Corporation no longer needed a Shipping Clerk as such since the functions of a Shipping Clerk had been distributed among several other employees, all of whom were required to lift over 40 pounds from time to time. Because of the nature of CTS' operations in Brownsville and the limited number of employees, it was simply not possible to modify the Shipping Clerk's job (or any other non-clerical job) to avoid lifting over 40 pounds from time to time.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October _30_, 2001.

_____
Josie Molina

CitaPDF - www.texla.com

# CTS CORPORATION IN TEXAS

**11.3**

## JOB DESCRIPTION

| TITLE | CLASSIFICATION |
|---|---|
| Shipping Clerk | Non-Exempt |
| **DEPARTMENT NAME** | **DEPARTMENT No.** |
| Brownsville Warehouse | C06810 |
| **REPORTS TO** | **REVISED DATE** |
| Warehouse Manager | 11/12/97 |
| **DIVISION** | **APPROVED BY** |
| CTS Brownsville | Josie Molina |

### BASIC FUNCTION:

Performs all duties per shipping procedures and work instructions to insure accurate and timely shipments.

### ESSENTIAL FUNCTIONS:

1.- Use Pansophic 8.2c software to perform inquiries and tracing of inventory transaction and stock movement and inputting shipment information into inventory system.

2.- Perform shipping duties per written procedure and work instruction completely and accurately.

3.- Use electronic scales or hand count parts to determine physical (actual) counts.

4.- Operate forklift, use calculator, and lift containers of parts as required to perfor duties.

5.- Complete required paperwork properly and accurately to insure correct quantities are shipped and entered into inventory.

6.- Assist material handler to allow all stock areas to be serviced in an orderly and timely manner while maintaining accurate inventory balances.

7.- Kit and pack orders per packaging instructions when workload in other areas require additional help.

8.- Assist in receiving as needed.

> **EXHIBIT**
> *A*
> Page 1 of 2

Rev. A

Page 1 of 2

000167

# CTS CORPORATION IN TEXAS

## 11.3

### JOB DESCRIPTION

**ESSENTIAL FUNCTIONS:**

9.-    Housekeeping duties required.

10.-    Participate in team meetings and team projects as required.

## ADDITIONAL RESPONSIBILITIES

1.-    Other duties as assigned.

2.-

3.-

## EDUCATION, EXPERIENCE, AND KNOWLEDGE

1.-    High School Graduate or Equivalent

2.-    Good Math skills

3.-    Use of calculator

4.-    Good communication skills

5.-    Operate forklift

6.-    Heavy lifting



EXHIBIT

A

Rev. A

# VALLEY DIAGNOSTIC CLINIC

2200 Haine / Harlingen, Texas 78550-8599
956/425-7200      1-800-338-4590

### Certificate to Return to Work or School

Name _Herrera, Jimmy_

has been under my care from _3/2/00_ to _present_

and is able to return to work/school on _3/31/00_ 

If unable to return to school/work you must return to this office on the above date.

☐ restrictions    ☑ light work    ☐ other _____

physical education  ☐ may take  ☐ limited  ☐ may not take

Comments _Dx: PVD_

Doctor _RC Brown_

Date _03/30/00_

M200434 (Rev. 5-97)

EXHIBIT
B




# VALLEY DIAGNOSTIC CLINIC, P.A.

04/10/00

RE:  Jimmy Herrera
     VDC# 87390

To Whom It May Concern:

Mr. Herrera has been under my care since March 2000.  The patient
suffers from severe peripheral vascular disease most likely the
vasculitis type.  This is mainly effecting the right lower
extremity and the left upper extremity.  As a consequences of
this vascularity the patient developed an unhealing ulcer
effecting the right lower extremity.  Arteriogram was performed
demonstrating complete occlusion of the popliteal artery at the
level of the right lower extremity and severe stenosis of the
brachial artery in the left upper extremity.

On basis of these factors the patient should have some
restrictions on his physical activity.  He will not be able to
lift or push weights more than 40 pounds and he should rest as
long as he develops pains during his walking activity.  The
patient also has my medical advice to have further appointments
with Dr. Kotta for further work-up of vasculitis and possibly he
will be involved in hyperbaric treatments for this unhealing
ulcer.

If you need any further assistance regarding Mr. Herrera please
do not hesitate in contacting me.

Sincerely,

ROLANDO C. ASCARRUNZ, M.D.

RCA/tl
DD:  04/10/00
DT:  04/10/00
JOB# 12095



April 12, 2000

Jimmy Herrera
Rt. 1 Box 101-J
San Benito Tx. 78586

Dear Mr. Herrera:

We have reviewed all our available jobs at the CTS Brownsville facility in light of your
current work restrictions. Our evaluation has found that no work is available for you at
this time as we are unable to accommodate your current work restrictions.

As a result of our evaluation, effective today, Wednesday, April 12, you will be placed on
Layoff status. You will be eligible for recall subject to a change in your work restriction
status.

Within the next few weeks you will receive information regarding your COBRA rights
which allow you to continue your group medical and dental coverage at your own
expense.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Josie Molina
Facility Manager
CTS Corporation
1100 Roosevelt St.
Brownsville TX. 78521

Cc:    Personnel file



EXHIBIT
D