IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 1 0 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JIMMY HERRERA, | * | |
| Plaintiff | * | |
| | * | CIVIL ACTION NO.: |
| v. | * | B-01-024 |
| | * | |
| CTS CORPORATION, ET. AL., | * | |
| Defendants | * | |

## CTS CORPORATION'S REPLY BRIEF
## TO PLAINTIFF'S RESPONSE TO
## CTS CORPORATION'S MOTION FOR SUMMARY JUDGMENT

In this reply brief, CTS Corporation will address two issues: 1) plaintiff's failure to explain the inconsistency between his receipt of Social Security disability benefits and his claim in this case that he could perform the essential functions of a shipping clerk with an accommodation; 2) plaintiff's failure to offer a reasonable accommodation for his inability to lift or pull over 40 pounds and his need to rest whenever his leg hurt.

Attached to this reply are:

1.  Affidavit of Vernon Pitcher;

2.  A copy of plaintiff's Job Description;

3.  A copy of plaintiff's medical restrictions;

4.  Additional excerpts from plaintiff's deposition (pages 19-20, 45, 52-53);

5.  Social Security determination letter, first page only; and

6.  Lucas v. Ericsson, Inc., 1998 US Dist. LEXIS 10760 (SD TX 7/13/98).

The job description, medical restrictions, and Social Security letter were authenticated in and submitted with defendant's principal brief and are included for the Courts convenience.

## A.    SOCIAL SECURITY DISABILITY

### 1.    Plaintiff has failed to explain the inconsistency between his Social Security claim and his disability discrimination claim.

Plaintiff asserts that his receipt of Social Security disability benefits does not mean that he could not do the job of a shipping clerk if someone else lifted containers of more than 40 pounds.

### a.    Plaintiff's Burden of Proof.

To survive summary judgment, plaintiff has the burden of establishing why his Social Security disability claim that he is unable to engage "in any other kind of substantial gainful work which exists in the national economy" is consistent with his disability discrimination claim that he is physically able to work, albeit with help lifting over 40 pounds.  As the Court held in Cleveland v. Policy Mgmt. Systems Corp., 526 US 795, 798 (1999):

> "Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work.  To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she couldn't perform the essential functions of her previous job, at least with reasonable accommodation."

The Court went on to describe the quality of the required explanation, holding that plaintiff must put forward an explanation:

> "...sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" Cleveland, supra at 807.

### b.     Plaintiff did not Meet his Burden.

In pursuing his successful application for disability benefits, the plaintiff

had to prove that he was disabled as defined by 42 USC § 423(d)(1)(A):

> "Disability means – inability to engage in any substantial gainful
> activity by reason of any medically determinable physical or
> mental impairment which can be expected to result in death or
> which has lasted or can be expected to last for a continuous
> period of not less than 12 months."

This inability to work is emphasized by the next subsection (42 USC §

423(d)(2)(A):

> "An individual shall be determined to be under a disability only
> if his physical or mental impairments are of such severity that
> he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage
> in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would
> be hired if he applied for work."

In other words, Jimmy Herrera had to convince the Social Security

Administration that his physical condition was so bad that he could not hold a job

of any kind any where.  As noted, he was successful in that endeavor and has

been receiving government checks on account of his disability since October

2000, based on a determination that he was disabled two days after he was

terminated by CTS.

Plaintiff's only explanation is that Social Security does not take

"reasonable accommodation" into account.  However, he fails to set forth specific

facts showing that a reasonable accommodation would permit him to do the

shipping clerk's job and, at the same time, leave him unable to do any job in the national economy.

In <u>Reed v. Petroleum Helicopters, Inc.</u>, 218 F3d 477, 480 (5 Cir. 2000), the Court of Appeals rejected an identical factually unsupported assertion:

> "Reed argues only that her prior sworn statements in applications for disability benefits did not take into account reasonable accommodations for her position. Reed gives no explanation as to how her statements were consistent with her claim that she could safely fly a helicopter, pass the necessary physical exam, and obtain the required certification, with or without other accommodation."

The only part of a shipping clerk's job which plaintiff says he was unable to do is lift over 40 pounds. Specifically, plaintiff says in his affidavit that he could:

1.   do clerical work (although conceding in his deposition at pp. 19-20 that he had no training in office work other than filing).

2.   perform all of the functions listed on the shipping clerk's job description such as operate a fork lift, lift containers of parts, do housekeeping chores, hand count parts, complete paperwork correctly, use a calculator, and assist in stocking.

His professed ability to perform these tasks (which the court should note would constitute "substantial gainful employment") in order to get money from CTS is plainly inconsistent with what he had to prove in order to get money from the Social Security Administration. Plaintiff offers no factual explanation for this inconsistency so his case should be dismissed.

### 2.   Plaintiff had health insurance at the time he became disabled for Social Security purposes.

Plaintiff also attempts to explain away the inconsistency by claiming that he lost his health insurance when he lost his job so he could not get proper medical treatment, resulting in his condition deteriorating to the point of disability.

What plaintiff fails to point out is that this deterioration happened in only two days during which he was covered by CTS health insurance. Plaintiff was terminated on April 12, 2000 and the Social Security Administration found him to be disabled as of April 14, 2000. See, Social Security Determination Letter. As the Affidavit of Vernon Pitcher shows, plaintiff's health insurance benefits continued until April 16, 2000.

Even if there were a time lag of any consequence between the date of termination and date of disability, plaintiff has failed to submit any competent evidence of a connection. The statements in paragraph (i) of his affidavit are statements of his subjective beliefs rather than statements of fact. Additionally, his statements are expert medical opinions which plaintiff has failed to demonstrate his competence to express. Defendant accordingly objects to paragraph (i) of Plaintiff's Affidavit and asks this Court to strike it.

**B.    PLAINTIFF'S STATEMENT THAT CTS CORPORATION COULD HAVE ACCOMMODATED HIM BY HAVING SOMEONE ELSE LIFT THE CONTAINERS OVER 40 POUNDS DISREGARDS THE REALITIES OF HIS WORKPLACE AND HIS OTHER RESTRICTIONS.**

**1.    Plaintiff's job was to assist, not be assisted.**

Plaintiff's job description provides that Herrera, among other things, was to "assist material handlers to allow all stock areas to be serviced " and to "kit and pack orders per packaging instructions when workload in other areas required additional help." In other words, when other areas of the warehouse needed assistance, it was his job to provide it, not the other way around. And this assistance was, in part, packing the very containers that he was required to lift and weigh.

With only 5 other people in the warehouse area (Molina declaration, ¶ 2), there simply were not people available to assist the person who was supposed to provide the assistance.

### 2.     Assigning a "Helper."

In addition, assigning a "helper" for an essential function has been held not to be a reasonable accommodation.  See, *e.g.* Lucas v. Ericsson, Inc., 1998 US Dist LEXIS 10760 (S.D. TX 7/13/98) (copy attached) and Hershey v. Praxair, Inc., 969 Fsupp 429 (S.D. TX 1997).

In Lucas, the plaintiff requested additional employees to help him with his data control duties; in Hershey, plaintiff requested an assistant to help him with heavy lifting.  In both cases, the courts held that these were not reasonable accommodations but rather reallocations of the essential functions of the job.  As the court in Lucas held:

> "Restructuring a job permits employers to accommodate disabled individuals by reallocating nonessential job functions.  However, the ADA does not require that an employer reallocate essential job functions." (Slip opinion, p. 21).

In addition, an accommodation such as assigning a helper which increases the workload of another employee is *per se* unreasonable.  Henderson v. New York Life, Inc., 991 Fsupp 527, 540 (N.D. TX 1997) ("The ADA does not require an accommodation that would result in other employees having to work harder or longer hours.").

### 3.     Plaintiff's Resting Restriction.

Plaintiff also fails to address the impact of his "rest as needed" work restriction.  ("...he should rest as long as he develops pain during his walking

activity." Exhibit 3 to Plaintiff's deposition). Plaintiff's only suggestion for accommodating this restriction was to allow him to sit in front of his computer and work when he had leg pain. (Plaintiff's deposition, pp. 52-53). It takes only a cursory review of plaintiff's job description to see that sitting in front of a computer is not a feasible way of doing a job which, at its core, requires a great deal of physical activity.

### 4.    Plaintiff's Professed Ability to do Some Work.

Plaintiff points to the fact that he did certain chores at work on the day he was terminated as proof he could work. In paragraph h) of his Affidavit, he asserts that he "was able to do housekeeping chores and was able to drive a forklift without incident." Plaintiff concedes that this was not a shipping clerk's job. (Plaintiff's deposition, p. 45). Since the focus in a disability discrimination case is on the job that plaintiff held, the fact that he could perform another job is immaterial (as well as inconsistent with his receipt of Social Security disability benefits).

The purpose of reasonable accommodation is to provide some reasonable mechanism by which plaintiff can perform the essential functions of his job. Neither assigning someone to lift containers that exceeds Herrera's job restrictions nor permitting him to sit in front of his computer when his leg hurts are reasonable. Defendant's motion for summary judgment should be granted.

### 5.    Transferring Heavy Containers.

Plaintiff also claims that the company's transfer of heavier containers to another work area proves that CTS could have accommodated him. This

argument proves too much for there are any number of ways CTS could have "accommodated" plaintiff up to and including putting him on fully paid leave until he was able to return to work without restrictions. The inquiry, however, is not that broad – the proper question is whether there was a <u>reasonable</u> accommodation that would have permitted plaintiff to perform the <u>essential</u> <u>functions</u> of his job. Cf, <u>Hershey v. Praxair, Inc.</u>, 969 FSupp 429, 434 (S.D. Tx. 1997) ("The Court now turns to the question of whether any reasonable accommodation by Defendant would enable Plaintiff to perform those essential functions."). Eliminating or reallocating an essential function of the job as plaintiff suggests is *per se* not a reasonable accommodation. <u>Bradley v. University of</u> <u>Tex. M.D. Anderson Cancer Center</u>, 3 F3d 922, 925 (5 Cir 1993) (decided under § 504 of the Rehabilitation Act of 1973, 29 USC 794).

The inescapable fact is that plaintiff could not lift or push anything over 40 pounds – an essential function of his job. Short of transferring these functions to another employee, there was no way to work around plaintiff's limitations.

### C.    CONCLUSION

Plaintiff has failed to set forth facts explaining how he can be disabled to the extent that he cannot "engage in any substantial gainful activity" (Social Security disability benefits) yet perform the essential functions of the physically demanding job of a shipping clerk. Likewise, he has failed to put forward any reasonable accommodation that would permit him to do his job consistent with his lifting, pushing, and resting restrictions.

Defendant's motion for summary judgment should be granted.

Signed this _/◔_ day of December 2001.

Respectfully submitted,

John E. Chosy Attorney-at-Law, P.C.
1805 Ruben M. Torres Blvd., Suite B-21
Brownsville, Texas   78526
Telephone:  (956) 544-6677
Telefax    :  (956) 544-6679

By: _____
     John E. Chosy
     State Bar No. 04216300
     Cameron County ID No. 00304801
     Federal I.D. No. 1054
     Attorney-in-Charge

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served on all counsel of record in this matter in accordance with the Federal Rules of Civil Procedure by ~~certified mail, return receipt requested~~ on the _/◔_ day of December 2001.
personal delivery

_____
John E. Chosy

## AFFIDAVIT OF VERNON PITCHER

STATE OF INDIANA     )
                              ) ss.
COUNTY OF ELKHART   )

Vernon Pitcher, being first duly sworn, on oath says that:

      1.     I am the Employee Benefits Manager for CTS Corporation, an Indiana corporation with its corporate headquarters located at 905 West Boulevard North, Elkhart, Indiana 46514. CTS Corporation has a location at 1100 Roosevelt St., Brownsville, Texas 78521 ("CTS"). The following facts are within my personal knowledge and, if called as a witness, I could testify competently with respect thereto.

      2.     When an employee of CTS Corporation is terminated, his or her health and dental insurance coverage terminates at midnight on the Sunday following the date of termination.

      3.     Employees may elect to continue their health and dental insurance coverage at their own cost, in accordance with COBRA.

      4     CTS uses a COBRA compliance service called COBRA Compliance Systems, Inc. ("CCS"), P.O. Box 889, Coldwater, MI 49036-0889. When a COBRA qualifying event occurs, such as termination of an employee, CTS submits a form to CCS, indicating the date of the qualifying event (the "Event Date") and the date of loss of coverage.

      5.     Attached is a true and accurate copy of the form that was filled out and submitted to CCS in connection with the termination of Jimmy Herrera. On this form, the "Event Date" is stated as April 14, 2000. The date of "Loss of Coverage" is April 16, 2000.

1

6.      April 14, 2000 was a Friday.  Jimmy Herrera's health and dental insurance coverage terminated at midnight on Sunday, April 16, 2000.

Further the affiant saith not.

Executed this ___7ᵗʰ___ day of December, 2001 at Elkhart, Indiana.

_____
Vernon Pitcher

Subscribed and sworn to this __7ᵗʰ__ day of __Dec.___, 2001, before me, a Notary Public in and for said County and State.

_____
Notary Public
Residing in Elkhart County

My Commission Expires:

KATHRYN J. DILLER
Elkhart County
My Commission Expires
July 29, 2007

2

```
┌─────────────────────────────────┐
│         THIS BOX FOR            │
│            CCS                  │
│            USE                  │
│           ONLY                  │
└─────────────────────────────────┘
```

**Account Name:** CTS AUTOMOTIVE PRODUCTS   **Account Number:** 8144A

Check here for Spanish Notice: ☐ Spanish      **Employee SS#:** 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

Optional

**Employee Name:**   Jimmy Herrera

**Address Notice is to be Mailed:**

Address:          FM 1577 Box 4490

City/State/Zip:   San Benito, TX 78586

Event Code: _E_   **Event Date:** 04 - 14 - 2000  **Loss of Coverage:** 04 - 16 - 2000

**If Event Code is OTHER THAN E, F or G:**
**Names of Person(s) Losing Coverage:**          Relationship to Employee

_____          _____

_____          _____

_____          _____

| Entire Plan | Medical | Dental | Vision | |
|---|---|---|---|---|
| Sgl $_____ | Sgl $205.30 | Sgl $23.10 | Sgl $_____ | Sgl $_____ |
| $_____ | $_____ | +1 $50.34 | $_____ | $_____ |
| $_____ | $_____ | $_____ | $_____ | $_____ |
| Fam $_____ | Fam $549.99 | Fam $92.35 | Fam $_____ | Fam $_____ |
| Day of Month Due ☐ | Day of Month Due 1st | Day of Month Due 1st | Day of Month Due ☐ | Day of Month Due ☐ |

Additional Address or Instructions:

_____

_____

**Authorized Signature:**  HUMBERTO PORTIER     **Date:** 4/20/2000

QE Form copyright © COBRA Compliance Systems, Inc. 11/1994

Q U A L I F Y I N G  E V E N T

# CTS CORPORATION IN TEXAS

11.3

## JOB DESCRIPTION

| TITLE | CLASSIFICATION |
|---|---|
| Shipping Clerk | Non-Exempt |
| DEPARTMENT NAME | DEPARTMENT No. |
| Brownsville Warehouse | CO6610 |
| REPORTS TO | REVISED DATE |
| Warehouse Manager | 11/12/97 |
| DIVISION | APPROVED BY |
| CTS Brownsville | Josie Molina  Jut 11/12/97 |

**BASIC FUNCTION:**

Performs all duties per shipping procedures and work instructions to insure accurate and timely shipments.

**ESSENTIAL FUNCTIONS:**

1.- Use Pansophic 8.2c software to perform inquiries and tracing of inventory transaction and stock movement and inputting shipment information into inventory system.

2.- Perform shipping duties per written procedure and work instruction completely and accurately.

3.- Use electronic scales or hand count parts to determine physical (actual) counts.

4.- Operate forklift, use calculator, and lift containers of parts as required to perform duties.

5.- Complete required paperwork properly and accurately to insure correct quantities are shipped and entered into inventory.

6.- Assist material handler to allow all stock areas to be serviced in an orderly and timely manner while maintaining accurate inventory balances.

7.- Kit and pack orders per packaging instructions when workload in other areas require additional help.

8.- Assist in receiving as needed.

**EXHIBIT**

**A**

Page 1 of 2

Rev. A

Page 1 of 2

CTS CORPORATION IN TEXAS

**11.3**

## JOB DESCRIPTION

ESSENTIAL FUNCTIONS:

9.-    Housekeeping duties required.

10.-    Participate in team meetings and team projects as required.


## ADDITIONAL RESPONSIBILITIES

1.-    Other duties as assigned.

2.-

3.-


## EDUCATION, EXPERIENCE, AND KNOWLEDGE

1.-    High School Graduate or Equivalent

2.-    Good Math skills

3.-    Use of calculator

4.-    Good communication skills

5.-    Operate forklift

6.-    Heavy lifting



EXHIBIT

A

Page 2 of 2



# VALLEY DIAGNOSTIC CLINIC, P.A.

04/10/00

RE:  Jimmy Herrera
     VDC# 87390

To Whom It May Concern:

Mr. Herrera has been under my care since March 2000.  The patient suffers from severe peripheral vascular disease most likely the vasculitis type.  This is mainly effecting the right lower extremity and the left upper extremity.  As a consequences of this vascularity the patient developed an unhealing ulcer effecting the right lower extremity.  Arteriogram was performed demonstrating complete occlusion of the popliteal artery at the level of the right lower extremity and severe stenosis of the brachial artery in the left upper extremity.

On basis of these factors the patient should have some restrictions on his physical activity. ████████████████████ The patient also has my medical advice to have further appointments with Dr. Kotta for further work-up of vasculitis and possibly he will be involved in hyperbaric treatments for this unhealing ulcer.

If you need any further assistance regarding Mr. Herrera please do not hesitate in contacting me.

Sincerely,

ROLANDO C. ASCARRUNZ, M.D.

RCA/tl
DD:  04/10/00
DT:  04/10/00
JOB# 12095

Defendant's Exhibit

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JIMMY HERRERA     ) (
   Plaintiff    ) (
          ) (
VS.        ) (  CIVIL ACTION NO. B-01-024
          ) (
CTS CORPORATION    ) (
   Defendant    ) (

---

ORAL DEPOSITION OF
JIMMY HERRERA
SEPTEMBER 13, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF JIMMY

HERRERA, produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on SEPTEMBER 13, 2001, from 9:20 a.m. to 11:21 a.m.,

before LOU ZUNIGA, Certified Court Reporter No. 2198,

in and for the State of Texas, at the offices of John

E. Chosy, 1805 Ruben M. Torres Boulevard, Paseo Plaza

Center, Suite B-21, Brownsville, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached therein.



HILL & ROMERO
CERTIFIED COURT REPORTERS

1   at CTS as a material handler.  Does that conform with

2   what you remember?

3       A.  Yes.

4       Q.  All right.  And at some point you became -- you

5   went from being material handler to being a shipping

6   clerk?

7       A.  I never was a material handler.  They put me in

8   there as a shipping clerk, and I stayed there.

9       Q.  All right.  So throughout -- I mean, even if

10  they did change your title as far as what you did every

11  day, you did the same job?

12      A.  Exactly, yes.

13      Q.

14

15

16      A.

17      Q.

18      A.

19      Q.

20      A.

21

22

23      Q.

24

25

1    A. ▓▓▓▓▓▓▓

2    Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4    A. ▓▓▓▓▓

5    Q. What was your job, either a material handler or

6    a shipping clerk?  It makes no difference because you

7    did the same thing, you told me.  What did you do in a

8    day?

9    A. Just receive packages from the other department

10   that was there.  The other department there would fill

11   up the boxes.  They would send them to me on a skid.  I

12   would weigh the boxes and stock them properly on a skid

13   and shrink-wrap them and load them in the truck with

14   the forklift.

15   Q. Where was this other department?

16   A. This other department was in the same

17   warehouse.

18   Q. Okay.

19   A. It was at the warehouse.

20   Q. So that department would pack boxes?

21   A. Pack boxes.

22   Q. And then once the boxes were packed, give it to

23   you?

24   A. Right.

25   Q. How much did these boxes weigh?

1    this one, sir.

2        A.  That's marked on the 10th.

3        Q.  Exhibit No. 3 is dated on the 10th.

4        A.  It must have been on the 11th.

5        Q.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6        A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7        Q.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8        A.  ▓▓▓▓▓

9        Q.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10       A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

11       Q.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13       A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14       Q.  Who did the shipping clerk's job?

15       A.  Well, the shipping clerk's job had been handed

16   down to Ms. Arreola already.

17       Q.  And she was doing the shipping clerk's job?

18       A.  Yes.

19       Q.  Okay.  What was she doing in terms of what

20   tasks was she doing?

21       A.  Basically the shipping, what I had been doing.

22   She was at a different department.  They took my system

23   and put it in a different department, so I wasn't fully

24   aware of who was helping her with the boxes as far as

25   shipping or lifting the boxes.

1    Q.  Okay.  You talked about doing the filing.  But

2  there was nobody that did just filing?

3    A.  No, I don't believe so.

4    Q.  Okay.  And how many -- I think you said there

5  was only one person that was hired after you were?

6    A.  Two persons were hired after.

7    Q.  Okay.  And do you recall either of their names?

8    A.  Nancy.

9    Q.  Okay.

10    A.  And the other person, if I met him, I don't

11  recall his name.

12    Q.  Okay.  What did he do?

13    A.  He was doing my job.

14    Q.  Okay.  Your old job or the modified system?

15    A.  The new system.

16    Q.  The new system?  Other than what's written down

17  in Exhibit No. 4, were you given -- did anybody at CTS

18  give you any other reason why you were laid off?

19    A.  No.

20    Q.  All right.

21

22

23

24    A.

25    Q.

1

2      A.

3

4

5

6      Q.   All right.

7      A.   We also had two breaks, one in the morning and

8  one in the afternoon, 15-minute breaks.

9      Q.   Did you talk to Josie Molina about having the

10 angioplasty and heart catheterization before you had it

11 done?

12     A.   Yes.

13     Q.   And about how far in advance did you talk to

14 her?

15     A.   As soon as I found out from the doctor.

16     Q.   Okay.

17     A.   I would say days.

18     Q.   All right.  And what did you tell her?

19     A.   I told her the procedure that I was going to

20 have.  She told me she knew that was because she had it

21 done to her husband, I believe, or her father, so she

22 knew the procedure.

23     Q.   All right.  Did she say anything else?

24     A.   No.

25     Q.   Okay.

# Social Securit   Administration
## Retirement, Survivors and Disability Insurance
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date:  October 17, 2000
Claim Number:  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HA

JIMMY HERRERA
1041 EBANO
SAN BENITO, TX 78586-3112
lluullulululdulululluullluullluulluldlululuulluludl

You are entitled to monthly disability benefits beginning October 2000.

### The Date You Became Disabled



However, you have to be disabled for 5 full calendar months in a row before you
can be entitled to benefits.  For these reasons, your first month of entitlement to
benefits is October 2000.

### What We Will Pay And When

- You will receive $706.00 for October 2000 around November 15, 2000.

- After that you will receive $706.00 on or about the third Wednesday of
  each month.

The day we make payments on this record is based on your date of birth.

### Other Social Security Benefits

The benefit described in this letter is the only one you can receive from Social
Security.  If you think that you might qualify for another kind of Social Security
benefit in the future, you will have to file another application.

### Your Responsibilities

The decisions we made on your claim are based on information you gave us.  If
this information changes, it could affect your benefits.  For this reason, it is
important that you report changes to us right away.

Enclosure(s):
Pub 05-10153

C                                    See Next Page

Defendant's Exhibit

5

**DONALD G. LUCAS, Plaintiff, v. ERICSSON, INC., Defendant.**

**CA3:97-CV-0847-BC**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

*1998 U.S. Dist. LEXIS 10760*

**July 13, 1998, Decided**

**July 13, 1998, Filed**

**DISPOSITION:**

[*1] Defendant's Motion for Summary Judgment filed May 1, 1998 GRANTED; Defendant's Motion to Dismiss filed April 13, 1998 DENIED as moot and Defendant's Motion to Strike Expert filed February 23, 1998 DENIED as moot.

**COUNSEL:**

DONALD G LUCAS, plaintiff, Pro se, Richardson, TX.

For ERICSSON INC, defendant: Audrey Elaine Mross, Attorney at Law, Haynes & Boone, Dallas, TX USA.

MAXEL B 'BUD' SILVERBERG, ADR Provider, Pro se, Dallas, TX USA.

**JUDGES:**

JANE J. BOYLE, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:**

JANE J. BOYLE

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Before the court is the **Defendant's Motion for Summary Judgment**, filed May 1, 1998. At issue is whether the Defendant is entitled to summary judgment because the Plaintiff has failed to set forth a prima facie case for discrimination under the Americans with Disabilities Act. Having considered the pertinent pleadings, the Court **GRANTS** the motion for the reasons that follow.

**I. Background** n1

> n1 These uncontested background facts are taken from the Def.'s Mot. For Summ. J., filed May 1, 1998, and the Pl.'s Resp. to Def.'s Mot. For Summ. J., filed May 21, 1998. Unless characterized as a contention, all background facts are undisputed.

[*2]

On October 30, 1989, the defendant, Ericsson, Inc. ("Ericsson"), hired the plaintiff, Donald G. Lucas ("Lucas"), for the position of data control clerk. While working as a data control clerk, Lucas sorted printed reports, ordered and maintained an inventory of supplies, serviced and performed prevent give maintenance on printers, and delivered printed reports and magnetic tapes to various buildings on the Ericsson campus.

In November of 1995, Lucas told Aaron Haynes ("Haynes"), the manager of the Customer Support Center, that he had been diagnosed with depression. In response, Haynes instructed Lucas to provide a doctor's note indicating that he was cleared for work. Accordingly, Lucas obtained a

1998 U S Dist. LEXIS 10760, *

note from Dr. Spurlock dated December 6, 1995. In his note, Dr. Spurlock explained that he diagnosed Lucas with mild depression on October 31, 1995, and that Lucas was responding well to medication. In addition, Spurlock stated that Lucas "should be able to do his work without much problem." n2

n2 The note provides as follows:

"Mr. Lucas has been seeing me for mild depression since 10/31/95. He is responding well to medication and should finish his course of therapy in 6 months. His symptoms have been loss of energy, insomnia, poor concentration, irritability, decreased motivation, [and] focusing on the negative. These [symptoms] should improve greatly over the next few months. He should be able to work equipment without any difficulty. He should be able to do his work without much problem. The medication does not cause drowsiness."

**Pl.'s App. to Resp. To Def.'s Mot. For. Summ. J., at 70.**

**[*3]**

In January of 1996, Haynes reorganized Data Control to increase the efficiency of the department. As a result of this reorganization, Lucas no longer had an assistant and was fully responsible for performing all of the data control clerk duties. Subsequently, Lucas informed Haynes that he was not able to perform all of the data control clerk duties by himself. In response, Haynes assigned Forrest Banks ("Banks") and Frank de la Rosa ("de la Rosa") to assist Lucas on a part-time basis. In addition, Lucas trained Chris Atilano ("Atilano") to take over the duties related to inventory and ordering supplies.

On March 8, 1996, Haynes and Lucas met to discuss Lucas' employment evaluation. Although Lucas received a number of "Good Job" ratings, his overall performance trend was characterized as "declining." The summary of Lucas' performance review reads as follows:

Don is dependable in executing his job duties and I have received a number of compliments from the

user community to the service he provides.

Don has requested that a number of his job duties be removed due to health problems. We have accommodated him in this regard with the removal of the ordering responsibility, **[*4]** morning deliveries, and most of the printer maintenance responsibilities. Don has been released from his Doctor to return to his full responsibilities. Over the next 6 months we will gradually add back all of his responsibilities.

**App. to Def.'s Mot. for Summ. J. at 145.**

On March 27, 1996, Lucas reported to work and discovered that Banks had failed to complete the morning delivery. Consequently, Lucas complained to his immediate supervisor, Marshall Miller ("Miller"), about Banks' deficient performance. Ericsson contends that during the conversation with Miller, Lucas "lost it" and voluntarily resigned. Conversely, Lucas contends either that he was fired or constructively discharged. n3 In any event, it is undisputed that after his conversation with Miller, Lucas left his ID badge, company keys, and a resignation letter on his desk. n4

n3 In his Second Amended Complaint, Lucas alleges that he was terminated. *See Pl.'s Second Am. Compl. P 9.* However, in his response to the defendant's motion for summary judgment, the plaintiff now argues that he was constructively discharged. *Pl.'s Br. at 11-12.* **[*5]**

n4 This letter provides as follows:

This is to inform you that I will be leaving Ericsson.

/s/ Don Lucas.

**App. to Def.'s Mot. for Summ. J. at 146.**

On June 6, 1997, Lucas filed an application for social security disability benefits. In support of his sworn application, Lucas certified that he was "disabled" and that his "disability began on March 27, 1996." In addition, Lucas acknowledged that it is a crime to make false statements in an application

1998 U. S. Dist. LEXIS 10760, *

for social security disability benefits. On November 29, 1997, the Social Security Administration (the "SSA") sent Lucas a Notification of Award letter informing him that under their rules, he was entitled to benefits because he was disabled as of March 27, 1996.

On April 16, 1997, Lucas filed suit against Ericsson contending that Ericsson discriminated against him in violation of the Americans with Disabilities Act. On May 1, 1998, Ericsson filed the instant motion for summary judgment arguing, *inter alia*, that Lucas cannot recover on his ADA claim because he cannot establish either that he is a "qualified individual with a disability," [*6] or that he notified Ericsson of any limitations caused by his disability. n5

> n5 Ericsson also argues that it is entitled to summary judgment because Lucas cannot show: (1) that he was subjected to an adverse employment action; and (2) that he was replaced by a non-disabled person or treated less favorably than non-disabled employees. However, the court need not address these issues since Ericsson's other arguments provide sufficient justification for granting defendant's motion for summary judgment.

## II. Analysis

### A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material facts exists and that, as a matter of law, the movant is entitled to judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "The substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, [*7] (1986). Only disputes about those facts will preclude the granting of summary judgment. *Id.* In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). If the non-movant bears the burden of proof at trial, the movant for summary judgment need not support the motion with evidence negating

the opponent's case; rather, the movant may satisfy its burden by showing that there is an absence of evidence to support the non-movant's case. *Id.; Little, 37 F.3d at 1075.*

Once the movant makes this showing, the burden shifts to the non-movant to show that summary judgment is not appropriate. *Little, 37 F.3d at 1075 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986)).* "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' ... by 'conclusory allegations,' ... by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.* [*8] *574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); Lujan v. National Wildlife Fed'n, 497 U.S. 871, 871-73, 110 S. Ct. 3177, 3180, 111 L. Ed. 2d 695 (1990); Hopper v. Frank, 16 F.3d 92, 97 (5th Cir. 1994); Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1086 (5th Cir. 1994)).* Rather, the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting FED. R. CIV. P. 56(e)).* Pro se litigants are not excused from this requirement. *Bookman v. Shubzda, 945 F. Supp. 999, 1004 (N.D.Tex. 1996).* n6 In determining whether a genuine issue for trial exists, the court must view all of the evidence in the light most favorable to the non-movant. *Richter v. Merchants Fast Motor Lines, Inc., 83 F.3d 96, 98 (5th Cir. 1996)(per curiam); Gremillion v. Gulf Coast Catering Co., 904 F.2d 290, 292 (5th Cir. 1990) (citing Bodnar v. Synpol, Inc., 843 F.2d 190, 192 (5th Cir.), cert. denied, 488 U.S. 908, 109 S. Ct. 260, 102 L. Ed. 2d 248 (1988).*

> n6 However, it is well-settled that the court is obligated to liberally construe a pro se litigant's response to a summary judgment motion.

[*9]

## The Americans with Disabilities Act

"The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are

available to persons without disabilities." *Taylor v. Principal Fin'l Group, Inc., 93 F.3d 155, 161* (5th Cir.)(citing 29 C.F.R. § 1630, App. (1995)), *cert. denied, 117 S. Ct. 586, 136 L. Ed. 2d 515 (1996)).* To set forth a prima facie case for discrimination under the ADA, Lucas must show that: (1) he suffers from a disability; (2) he is qualified for the job; (3) that he was subject to an adverse employment action; and (4) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *93 F.3d at 162* (citation omitted). n7 The parties do not dispute that Lucas suffers from a disability. Thus, the Court will first consider whether Lucas is a "qualified individual with a disability."

> n7 These elements apply where the plaintiff attempts to satisfy his prima facie case with indirect evidence. *Taylor, 93 F.3d at 162.* Here, although the plaintiff argues that he has presented direct evidence of discrimination, the Court finds that the plaintiff has presented no direct evidence of discrimination whatsoever. Consequently, it is appropriate for the Court to apply indirect method of proof set forth in McDonnell Douglas. *Taylor, 93 F.3d at 162.*

[*10]

### 1. Qualified Individual

The ADA prohibits discrimination against a "qualified individual with a disability." *42 U.S.C.A. § 12112(a).* In order to establish a prima facie case, the plaintiff must show that, in addition to being disabled, he is a qualified individual. *Cleveland v. Policy Management Systems Corp., 120 F.3d 513, 516 (5th Cir. 1997).* A qualified individual with a disability is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C.A. § 12111(8).* The determination of whether an individual is qualified is made at the time of the employment decision and involves two steps. 29 C.F.R. App. § 1630.2(m). First, the employee must satisfy job prerequisites, including educational background, experience, skills, licenses, etc. *Id.* Second, he must be able to perform the

essential functions of the position held or desired, with or without reasonable accommodation. *Id.* However, in the Fifth Circuit, if an ADA plaintiff has applied for or received social security disability benefits, there [*11] is a rebuttable presumption that the claimant or recipient of such benefits is judicially estopped from asserting that he is a "qualified individual with a disability." *McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 562 (5th Cir. 1998); Cleveland, 120 F.3d at 518.*

In this case, Ericsson argues that Lucas has failed to present credible evidence sufficient to rebut the presumption that by applying for and receiving social security benefits, he is judicially estopped from asserting that he is a qualified individual with a disability. In response, Lucas contends that he was not disabled and was capable of performing the essential functions of a data control clerk at the time he left the defendant's employ.

In *Cleveland, supra,* the Fifth Circuit declined to adopt a per se rule that would "automatically estop ...a recipient of social security benefits from asserting a claim of discrimination under the ADA." *Cleveland, 120 F.3d at 517.* The Fifth Circuit explained that it rejected a per se rule because "it is at least theoretically conceivable that under some limited and highly unusual set of circumstances the two claims would not necessarily be mutually [*12] exclusive. . . ." *Id.* Later in its Opinion, the Cleveland Court explained that a plaintiff might be able to rebut the presumption he is judicially estopped "if he were able to present credible, admissible evidence -- such as his social security benefits application, other sworn documentation, and his allegations relevant to his ADA claim -- sufficient to show that, even though he may be disabled for purposes of social security, he is otherwise qualified to perform the essential functions of his job with a reasonable accommodation ..." *Id.*

Here, Lucas argues that he is not estopped from asserting that he is a qualified individual by his social security benefits application because in his application, he only declared that he was "disabled," not "totally disabled." The Court rejects this argument for two reasons. First, in support of his application for benefits, Lucas submitted a letter from Dr. Turpin. In his letter to the SSA, Dr. Turpin

explained that, in his opinion, Lucas was "permanently disabled" and therefore a deserving candidate for disability benefits. **App. To Def.'s Mot. For Summ. J., at 157.** Thus. even though Lucas did not directly assert that [*13] he was totally disabled, he did so indirectly by submitting a note from his doctor to support his application. Second, in the absence of any authority to the contrary, the Court finds it inappropriate to create a distinction between those applicants for social security disability benefits who certify that they are "disabled" rather than "totally disabled." Instead, as instructed by the Fifth Circuit, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

In an effort to rebut the presumption that he is estopped, Lucas next argues that his most recent employment evaluation shows that he could perform the essential functions of his job when he left Ericsson. Specifically, Lucas contends that his ability to perform the essential functions of his job is corroborated by his employment evaluation because he received a "Good Job" rating in 14 of 16 categories several weeks prior to leaving Ericsson. n8 Under the judicial estoppel doctrine, a party may not assert a position in a legal proceeding that is inconsistent with [*14] a position taken in the same or an earlier proceeding. *Ergo Science, Inc. v. Martin, 73 F.3d 595, 598 (5th Cir. 1996).* n9 Here, the inconsistent position being taken by Lucas is the declaration he made in his application to the SSA that he was disabled as of March 27, 1996. and his assertion in this case that on March 27, 1996, he was a qualified individual with a disability. **See App. To Def.'s Mot. For Summ. J., at 147.** Accordingly, the Court finds that although the employment evaluation certainly is relevant circumstantial evidence, standing alone it is insufficient for Lucas to satisfy his burden of proving that he was able to perform the essential functions of his job almost three weeks later, on March 27, 1996 n10 The Court is especially confident of this result because, as discussed previously, in addition to providing a number of "Good Job" ratings. the evaluation also indicates that Lucas was unable to perform many of the duties of his position due to health problems.

n8 The Court notes that a review of the evaluation indicates as follows: (1) Lucas received a rating of "Good Job" in 10 of 13 categories; (2) a rating of acceptable in 3 of 3 categories; (3) 2 of 13 "Room for Improvement" ratings; and (4) an "other" category that was left blank. **Pl.'s App. To Resp. To Def.'s Mot. For Summ. J., at 84-92. [*15]**

n9 The judicial estoppel doctrine is designed to prevent "parties from playing fast and loose with the courts to suit the exigencies of self interest." *Brandon v. Interfirst Corp., 858 F.2d 266, 268 (5th Cir. 1988)*(citation omitted).

n10 Indeed, the plaintiff's own doctor (Dr. Spurlock) indicated that the precise starting point of Lucas' disability was hard to pinpoint and that Lucas "had a flare-up *just before he left Ericsson."* **Pl.'s App. To Def.'s Mot. For Summ. J., at 97 (emphasis added).** Under these circumstances, a three week lapse of time is substantial.

Moreover, the plaintiff's efforts to rebut the presumption that he is estopped from asserting that he is a qualified individual with a disability are especially unpersuasive in light of the deposition testimony of the plaintiff's own treating physicians. In his deposition, Dr. Turpin testified that he first saw Lucas on May 6, 1996. Dr. Turpin further testified that, because of his depression, Lucas was not capable of working for a period of three to six months prior to that visit. **Pl.'s App. To Resp. [*16] To Def.'s Mot. For Summ. J., at 100.** Thus, according to one of Lucas' own doctors, he was unable to work because of his disability no later than February 6, 1996. more than six weeks prior to March 27, 1996. In addition, Dr. Turpin's opinion is corroborated by the testimony of Dr. Spurlock, Lucas' Family Physician. In his deposition, Dr. Spurlock testified that "at the point that he left Ericsson, I believe he was disabled ..." **App. To Def.'s Mot. For Summ. J., at 98.** n11

n11 The plaintiff also contends that the fact that Ericsson offered to rehire him after

Case 1:01-cv-00024   Document 19   Filed in TXSD on 12/10/2001   Page 28 of 30

he left on March 27, 1996 establishes that he could perform the essential functions of a data control clerk. The Court does not agree that the mere fact that Ericsson offered to rehire Lucas means that he was capable of performing the essential functions of his job. Indeed, the plaintiff's performance evaluation indicates that Lucas was unable to perform many of his duties due to health problems. In any event, even after taking into account the defendant's offer to rehire the plaintiff, in light of Lucas' application for social security benefits and the deposition testimony of his treating physicians, the Court finds that this evidence is insufficient to rebut the presumption that at the time he left, he was capable of performing the essential functions of his job.

## [*17]

In sum, the Court finds that Lucas has failed to present sufficient credible evidence to show that, despite being disabled for Social Security purposes, he was otherwise qualified to perform the essential functions of a data control clerk with reasonable accommodations on March 27, 1996. Here, in his sworn application for disability benefits, the plaintiff claimed that he was disabled on March 27, 1996. Further, both of his treating physicians testified that in their opinion, the plaintiff was disabled prior to, or no later than, March 27, 1996. Because Lucas has been receiving social security benefits since March 27, 1996 based on his statements to the SSA, the plaintiff cannot now be heard to complain that he was capable of performing the essential functions of his data control clerk position on March 27, 1996. Accordingly, because Lucas has failed to raise a genuine issue of material fact rebutting the presumption that he is judicially estopped from asserting that he was a qualified individual with a disability for purposes of his ADA claim, the Court grants Ericsson's motion for summary judgment.

## 2. Failure to Identify Accommodation

Even if the Court determined that [*18] Lucas was not judicially estopped from asserting that he is a qualified individual with a disability, Ericsson would still be entitled to summary judgment

because Lucas has failed to tender summary judgment evidence showing that Ericsson failed to provide a reasonable accommodation. Generally, it is the employee's responsibility to inform the employer that an accommodation is needed. *Taylor, 93 F.3d at 165* (**citing 29 C.F.R. § 1630.9, App. (1995)**). Once the employee requests an accommodation, "the appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability '" *Id.* Thus, an employer's obligation to participate in the interactive process of fashioning a reasonable accommodation is triggered by the employee's request for an accommodation. *Id.* "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Id.*

Here, Ericsson contends that it is entitled to summary judgment because Lucas failed to provide notification that he was disabled and in need of a reasonable accommodation. In [*19] response, Lucas argues that he informed Ericsson of his disability verbally in November of 1995, and in writing by submitting a note from his doctor in December of 1995. **See n. 2, *supra*.** However, although this evidence indicates that Lucas told Ericsson that he was diagnosed with a disability, Lucas does not tender any summary judgment evidence to show that he informed Ericsson of any limitations he experienced as a result of his disability. "This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities." *Taylor, 93 F.3d at 164.* Thus, to withstand Ericsson's motion for summary judgment, Lucas must adduce summary judgment evidence to indicate not only that he informed Ericsson that he was disabled, but also that he told Ericsson that he was limited as a result of his disability. *Id.* Here, the doctor's note that Lucas provided in December of 1995 does not indicate that Lucas needed any accommodations to perform his duties as a data control clerk. **See n. 2, *supra.*** Indeed, the note expressly states that Lucas "should be able to do his work without much problem." *Id.* Accordingly, [*20] the December 1995 doctor's note did not satisfy Lucas' obligation to notify Ericsson that he experienced a limitation as a result of his disability. n12 Thus, Ericsson's duty to participate in the interactive process of fashioning a reasonable accommodation for Lucas

1998 U.S. Dist. LEXIS 10760. *

clearly was not triggered either by the verbal notice in November of 1995. or by the December 1995 doctor's note.

> n12 As explained previously, Haynes requested the doctor's note to determine if Lucas was capable of working in light of his November 1995 verbal reports that he was diagnosed with depression. Since the doctor's note related to his verbal notice fails to identify the need for an accommodation, Lucas cannot satisfy his burden through reliance on his prior verbal notice.



The ADA provides, in pertinent part, that the term reasonable accommodation may include"

...job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters and other similar accommodations for individuals with disabilities.

*42 U.S.C.A. § 12111(9)*. The appendix to the EEOC's regulations provides that reasonable accommodations "usually take the form of adjustments to the way a job customarily is performed. or to the work environment itself. **29 C.F.R. § 1630, App. Background (1996).** Restructuring a job permits employers to accommodate disabled individuals by reallocating nonessential job functions. **29 C.F.R. § 1630.2(o); App. § 1630.2(o).** However, the ADA does not require that an employer reallocate essential **[\*22]**

job functions. *Id; Milton v. Scrivner, Inc., 53 F.3d 1118, 1124-25 (10th Cir. 1995); Holbrook v. City of Alpharetta, Georgia, 112 F.3d 1522, 1527-28 (11th Cir. 1997).*

In this case, even assuming that Lucas satisfied his burden of informing Ericsson that he experienced a limitation as a result of his disability,

It is undisputed that the essential functions of the data control clerk position "have always included sorting and delivering printed documents, printer maintenance, and ordering and inventory." **Pl's Resp. at 3.** Specifically, according to Lucas, at the time of his termination, his duties included: "four deliveries of documents printed in the large printers, the delivery of magnetic tapes throughout the campus, ordering and inventory of supplies, preventive maintenance and servicing all printers on campus, [and the] documentation of procedures." *Id.* at 3-4. Lucas contends that Ericsson could have accommodated him by assigning "additional employees **[\*23]** to assist him with the duties of the department." **Pl.'s Br. at 8.** Indeed, the record indicates that Haynes did accommodate Lucas' request for assistance by relieving him of some of the essential duties of his position. As explained previously, Haynes assigned Banks and de la Rosa to assist Lucas with the sorting and printing deliveries on a part-time basis. In addition, Atilano was trained to assume duties related to the ordering and inventory of supplies. Further, Lucas' final performance evaluation indicates that many of his duties were "removed due to health problems." **App. to Def.'s Mot. for Summ. J. at 145.** However, the fact that Ericsson was able to accommodate the plaintiff by providing him with additional assistance does not mean that it was legally obligated to do so by the ADA. *Holbrook, 112 F.3d at 1528* **(affirming summary judgment award for employer where the employee could not perform an essential function of his position even though the employer previously exceeded the ADA's requirements by accommodating the employee).**

In this case. Lucas did not request an adjustment in the way his job was performed. or an adjustment to the work environment itself. **[\*24]**

Likewise, Lucas did not request merely that Ericsson reallocate the nonessential functions of his data control clerk position. Instead, Lucas requested that other employees perform many of the essential functions of his position on his behalf. Even though Ericsson complied with his request, they were not legally obligated to do so under the ADA. **29 C.F.R. App. § 1630.2(o); Milton, 53 F.3d at 1124-25; Holbrook, 112 F.3d at 1527-28.** Accordingly, because Lucas failed to identify any reasonable accommodation that would not have required Ericsson to reallocate the essential functions of his position, the Court finds that Ericsson is entitled to summary judgment. **Milton, 53 F.3d at 1124 ("An employer is not required by the ADA to reallocate job duties in order to change the essential functions of the job."); Larkins v. CIBA Vision Corp., 858 F. Supp. 1572, 1584 (N.D. Ga. 1994)(defendant entitled to summary judgment where the plaintiff could suggest no accommodations other than the elimination of some of the essential functions of her position); Henderson v. New York Life, Inc., 991 F. Supp. 527, 540 (N.D. Tex. 1997) ("The ADA does not require an accommodation [*25] that would result in other employees having to work harder or longer hours")(citation omitted); Simmerman v. Hardee's Food Systems, Inc., 1996 U.S. Dist. LEXIS 3437, No. 94-6906, 1996 WL 131948, at *8-9 (E.D. Pa., March 22, 1996) (defendant entitled to summary judgment where plaintiff suffering from depression sought the elimination of an essential function of his position as a reasonable accommodation), aff'd, 118 F.3d 1578 (3d Cir. 1997).**

In sum, Lucas is unable to perform the essential functions of the data control clerk position with or without reasonable accommodation. Lucas has not suggested any accommodations other than those that would require Ericsson to eliminate many of the essential functions of the data control clerk position. Further, the record indicates that, although it was not required to reallocate essential functions of the data control clerk position, Ericsson attempted to accommodate Lucas' disability by directing other employees to perform essential functions of plaintiff's job. Under these circumstances, the Court finds that no genuine issues of material fact exist as to Lucas' ADA claim, and that Ericsson is entitled to summary judgment as a matter of law.

### III. Conclusion [*26]

Accordingly, the undersigned **ORDERS** as follows:

(1) that the Defendant's Motion for Summary Judgment, filed May 1, 1998, be **GRANTED;**

(2) that Defendant's Motion to Dismiss, filed April 13, 1998, be **DENIED** as moot;

(3) and that Defendant's Motion to Strike Expert, filed February 23, 1998, be **DENIED** as moot.

**SO ORDERED.**

**July 13, 1998.**

**JANE J. BOYLE**
**UNITED STATES MAGISTRATE JUDGE**